IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HONORABLE JOHN SIEFERT,

                Plaintiff,

       v.

JAMES C. ALEXANDER, in his official
capacity as the Executive Director of the
Wisconsin Judicial Commission;
GINGER ALDEN, in her official capacity
as a Member of the Wisconsin Judicial Commission;
DONALD LEO BACH, in his official capacity as a
Member of the Wisconsin Judicial Commission;
JOHN R. DAWSON, in his official capacity as a
Member of the Wisconsin Judicial Commission;
DAVID A. HANSHER, in his official capacity as
a Member of the Wisconsin Judicial Commission;
GREGORY A. PETERSON, in his official capacity
as a Member of the Wisconsin Judicial Commission;
WILLIAM VANDER LOOP, in his official capacity
as a Member of the Wisconsin Judicial Commission;
MICHAEL R. MILLER, in his official capacity as a
Member of the Wisconsin Judicial Commission;
JAMES M. HANEY, in his official capacity as a
Member of the Wisconsin Judicial Commission,

                Defendants.

OPINION AND ORDER

08-cv-126-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

A commitment to judicial independence and impartiality has long been viewed as one
of the cornerstones of the American judiciary.  Courts maintain their legitimacy only so long

as those who walk through the courthouse doors believe that they are being treated fairly, that is, that the judge is deciding the case on the basis of his or her view of the law and facts and not on the basis of an outside influence or bias.

Just as central to American democracy is the belief in free expression and open government. Under the First Amendment, generally the view is that more rather than less information advances democratic values and that the government should not be the arbiter of which ideas are true or false, important or unimportant, helpful or harmful. Particularly in the context of popular elections, it is the people who decide through their votes which message resonates.

In the context of judicial elections, questions arise about the compatibility of these two fundamental values. Should a candidate's or judge's speech be limited to prevent him from making statements that could make him appear biased? If so, under what circumstances is such a restriction appropriate? How can the integrity of the judiciary be preserved without unduly inhibiting the conversation between a judicial candidate and the electorate? These difficult questions are at the heart of the dispute between the parties in this case.

Plaintiff John Siefert is an elected Wisconsin circuit court judge in Milwaukee County who would like to state his affiliation with the Democratic Party, endorse partisan candidates for office and personally solicit contributions for his next election campaign, but

2

he fears violating provisions of the Wisconsin Code of Judicial Conduct that prohibit these activities.  Rather than violate the provisions and subject himself to discipline, plaintiff filed this suit for declaratory and injunctive relief under 42 U.S.C. § 1983 against the members of the Wisconsin Judicial Commission responsible for enforcing the code, seeking a determination of his right to undertake the prohibited activities.  Plaintiff says that the rules violate his right to free speech; defendants say that the rules are necessary to keep judges from being improperly influenced by partisan considerations, to maintain public confidence in the Wisconsin judiciary and to prevent potential donors from feeling coerced into giving money.  The parties' cross motions for summary judgment are now ripe for review. (Wisconsin's attorney general invited the State Bar of Wisconsin to file an amicus brief, but it declined to do so.  Dkt. #47.)

Over the years, many states with elected judges and many bar associations, including the American Bar Association, have addressed what they see as factors working against the goal of maintaining an impartial judiciary.  To that end, they have developed canons of judicial conduct, forbidding such activities by candidates for judicial office as announcing their views on disputed legal and political issues,  making personal solicitations of funds or endorsements and engaging in partisan activities or even identifying themselves as members of a particular party.  In 2002, the United States Supreme Court ruled the first of these restrictions unconstitutional, holding that the First Amendment was violated when judicial

3

candidates were prohibited from announcing their views on disputed issues likely to come before the court.  Republican Party of Minnesota v. White, 536 U.S. 765 (2002).  In 2005, the Court of Appeals for the Eighth Circuit ruled that the First Amendment made unconstitutional bans against direct solicitation and the partisan activities of identifying oneself as a member of a political organization, attending political gatherings or accepting endorsements from a political organization.  Republican Party of Minnesota v. White, 416 F.3d 738 (8th Cir. 2005).  These two cases have transformed the legal perspective from which the canons of judicial conduct are viewed.

Wisconsin is one of the states that has worked to maintain a judiciary that is perceived as impartial. Among the canons adopted by the Supreme Court of Wisconsin in pursuit of this goal are three that plaintiff is challenging in this suit.  SCR 60.06(2)(b)(1) provides that no judge or judicial candidate may be a member of any political party.  SCR 60.06(2)(b)(4) provides that no judge or judicial candidate may publicly endorse or speak on behalf of a political party's candidates or platforms.  SCR 60.06(4) provides that a judge, candidate for judicial office, or judge-elect shall not personally solicit or accept campaign contributions.

Reviewing these canons in light of the Supreme Court's opinion in White (White I) and defendants' failure to show that any of the rules challenged by plaintiff is narrowly tailored to promote a compelling state interest, as required under the First Amendment, I

4

must conclude that the rules at issue do not withstand strict scrutiny.  This conclusion should not be viewed as denigrating the conscientious efforts made by the state supreme court and many lawyers over many years to draft canons that they believe are necessary to maintain a non-partisan judiciary.  It may be that the job is impossible.  Once a state decides, as Wisconsin has, that judges are to be democratically elected along with the members of the other two branches of government, the task of legislating nonpartisanship and the appearance of impartiality without violating the First Amendment becomes a thicket of complexity.

From the parties' proposed findings of fact, I find that the following facts are undisputed.

## UNDISPUTED FACTS

Plaintiff John Siefert has been a judge of the Circuit Court for Milwaukee County since he was first elected in 1999.  Defendant James Alexander is the executive director of the Wisconsin Judicial Commission; defendants Ginger Alden, Donald Leo Bach, John Dawson, David Hansher, Gregory Peterson, William Vander Loop, Michael Miller and James Haney are members of the commission.

The commission investigates and prosecutes potential violations of the Wisconsin Code of Judicial Conduct, which regulates the behavior of judges and judicial candidates.

5

In Wisconsin, state court judges are selected through nonpartisan elections, meaning that a judicial candidate is not nominated by a political party and no party affiliation appears next to the candidate's name on the ballot.

## A.  Plaintiff's Background

Before plaintiff was a circuit court judge, he had been a member of the Democratic Party and participated in a number of partisan activities, including:

- serving as a delegate to the Democratic National Convention;

- twice running as a Democrat for the state legislature;

- twice running as a Democrat for county treasurer; holding that office from 1990 to 1993;

- serving as an alternate elector for President Bill Clinton in 1992.

Plaintiff would like to join the Democratic Party again, endorse partisan candidates and personally solicit campaign contributions, but he fears that doing so will subject him to discipline for violating the code of judicial conduct.  In particular, with respect to becoming a member of the Democratic Party, he would like to list his party membership in response to candidate questionnaires.  (He does not seek to have his party affiliation listed on the ballot; such a listing is prohibited by Wis. Stat. §§ 5.58 and 5.60 and is not the subject of this suit.)  He believes membership in the Democratic Party would communicate his desire

6

for social justice and peace.  He understands that voters may use party affiliation as a "shorthand" for many of his views, but he does not wish to appeal to partisanship as a candidate or as a judge.

With respect to endorsing partisan candidates, plaintiff wanted to endorse Barack Obama in the 2008 presidential election.  In the future, plaintiff would like to endorse Jim Doyle for governor of Wisconsin in 2010 and President Obama if he decides to run for reelection  in 2012.

With respect to fund raising, plaintiff would like to solicit contributions for his upcoming 2011 campaign and to pay off debts from his past campaigns by making phone calls to potential contributors, signing his name to fund-raising letters and by personally inviting potential donors to fund raising events.  He does not challenge the need for a campaign committee to handle the ministerial tasks of fund-raising and take responsibility for the collection and reporting of donations.

B.  Historical Background[1]

---

[1] The facts regarding the history of the Wisconsin judiciary come from defendants' legal historian, Joseph Ranney, who cites a number of sources such as John Bradley Winslow, The Story of a Great Court (1912), and Milo M. Quaife, The Attainment of Statehood (1928), as well as a number of original documents.  Plaintiff does not dispute Ranney's account.

Since Wisconsin became a state in 1848, the Wisconsin Constitution has required that state court judges be chosen by popular election.  Wis. Const. art. VII, §§ 4-6.  Political parties made the first supreme court nominations at party conventions, despite concerns by some that "an openly partisan jury would be subject to corrupting influences."

In <u>In re Booth</u>, 3 Wis. 54 (1854), the supreme court held by a 2-1 vote, with Justice Samuel Crawford dissenting, that the federal Fugitive Slave Act of 1850 was unconstitutional.  Following the court's decision, Wisconsin defied federal efforts to enforce the law.  Justice Crawford was defeated for reelection in 1855 largely because of his dissent in <u>Booth</u> rather than any concerns about his legal abilities.

In <u>Ableman v. Booth</u>, 21 How. (62 U.S.) 514 (1859), the United States Supreme Court reversed the Wisconsin Supreme Court's 1854 <u>Booth</u> decision. The Wisconsin Supreme Court then voted not to file the United States Supreme Court's decision, with Chief Justice Luther S. Dixon dissenting. <u>Ableman v. Booth</u>, 11 Wis. 501 (1859).  Although Dixon was a Republican and his legal abilities were highly respected, the 1860 Republican convention refused to nominate him for reelection because of his dissent. Dixon was nominated by an independent convention and was narrowly reelected.

During the late 1840s and early 1850s, many Wisconsin farmers purchased railroad stock by giving promissory notes secured by mortgages on their land in order to obtain railroad service for their communities. Following a depression in 1857, many railroads went

8

into receivership and financiers to whom they had sold the farmers' promissory notes attempted to foreclose on the mortgages. The Wisconsin legislature enacted a series of laws promoting debtor relief, most of which the Wisconsin Supreme Court declared unconstitutional. During the early 1860s, many farmers and their supporters formed the Grand State League to promote debtor relief.  With the league's support, the Democratic Party several times nominated supreme court candidates to oppose sitting justices up for reelection; the opposing candidates ran largely on a platform of debtor relief. No sitting justice was defeated, but the results were often quite close.

An informal tradition developed of preserving a "partisan balance" on the court.  In 1878, when the size of the court was expanded from three to five justices, legislative caucuses of both parties arranged to nominate one Democrat and one Republican as consensus candidates for the new seats to achieve balance on the bench.

The last judicial election contest with "overt partisan tones" was held in 1895 when then-Justice John B. Winslow, a Democrat, narrowly won reelection over his Republican opponent.  In 1909, the election of Justice John Barnes created an apparent Democratic majority on the supreme court despite the fact that voters consistently elected Republican governors and legislatures during this time and the Democratic Party was very weak. Little attention was paid to Barnes's party affiliation or to partisan affiliations of the justices, demonstrating "the absolute disappearance of partisan considerations" by that time.

In the late 1800s, the state legislature and the voters began making a number of changes to the nomination and election process of judges and other candidates for office:

- in 1891, the legislature removed the requirement to place party designations on "ballots for school or judicial offices" in municipalities of populations less than 50,000;

- in 1898, the legislature removed the "straight party ticket" option from Wisconsin ballots (this option has since been restored, Wis. Stat. § 5.64(1)(ar)1.a);

- in 1903, the legislature passed a law replacing the caucus system of choosing candidates with open primaries; the voters ratified this decision in 1904;

- in 1911, the legislature allowed nonpartisan nominations to be made in judicial elections.

Finally, in 1913, the legislature passed a law making all judicial elections nonpartisan: "No candidate for any judicial or school office shall be nominated or elected upon any party ticket, nor shall any designation of party or principle represented be used in the nomination or election of any such candidate." Current law continues to prohibit party designations from appearing on the ballot for judicial elections as well as a number of other offices. Wis. Stat. §§ 5.58 and 5.60.

In 1915, a committee headed by Chief Justice Winslow was formed to consider

improvements to the Wisconsin judiciary. In its report to the legislature, the committee wrote:

> The unwritten code which has so happily developed in this state, by which a circuit judge who shows his fitness for the office is retained in the service without regard to political considerations term after term, has been of great service in rendering our courts stable, learned and respected. It has also tended strongly to make them independent and fearless and has well nigh put an end to the judge with his ear to the ground.

In 1934, the Wisconsin Bar Association recommended that the state's elective judicial system be replaced with one consisting of appointment by the governor followed by the voters' option to retain the judge every six years. This recommendation was never adopted or seriously considered by the legislature. In 1938, the bar prepared another report in which it stated: "Thanks to our completely nonpartisan judicial elections, and the conscientious manner in which our governors of all parties have, in the main, made their judicial appointments in the past, the Wisconsin judicial system is not in any dire need of change."

In 1968, the Wisconsin Supreme Court amended the judicial code of conduct to prohibit judges from joining a political party. In October 2004, the supreme court amended the code to extend a number of rules to cover judicial candidates as well as judges, including prohibitions on party membership, partisan endorsements and personal solicitation of campaign contributions. In the Matter of the Amendment of Supreme Court Rules: SCR Chapter 60, Code of Judicial Conduct—Campaigns, Elections, Political Activity, No. 00-07,

11

2004 WI 34 (Oct. 29, 2004).


OPINION

The starting point for each of plaintiff's claims is <u>Republican Party of Minnesota v. White</u>, 536 U.S. 765 (2002) (<u>White I</u>), in which the Supreme Court held that a judicial ethical canon violated the First Amendment by prohibiting judicial candidates from "announcing" their views on "disputed political and legal issues." Plaintiff contends that the provisions he is challenging are legally indistinguishable from Minnesota's announcement canon and therefore must fall under <u>White I</u>. He also relies on the decision by the Court of Appeals for the Eighth Circuit after <u>White I</u> was remanded in which the court invalidated rules prohibiting judges from engaging in partisan activity and personally soliciting campaign contributions. <u>Republican Party of Minnesota v. White</u>, 416 F.3d 738, 755 (8th Cir. 2005) (en banc) (<u>White II</u>). Defendants contend that <u>White II</u> was wrongly decided and that <u>White I</u> is not instructive because that case did not involve rules limiting partisan activity or campaign solicitations and because Wisconsin's rules do not prevent judicial candidates from effective campaigning as Minnesota's did.

Although I disagree with plaintiff that <u>White I</u> is on all fours with this case, defendants cannot cabin <u>White I</u> to its precise facts. It provides an important framework for evaluating plaintiff's claims.

12

### A.  SCR 60.06(2)(b)1:  Party Membership

Wisconsin Supreme Court Rule 60.06(2)(b)1 says that "[n]o judge or candidate for judicial office or judge-elect may . . . [b]e a member of any political party."  The rules permit those with previous political ties to run for judicial office, SCR 60.06(2)(a), and they permit a "partisan political office holder who is seeking election or appointment to judicial office or who is a judge-elect . . . to engage in partisan political activities required by his or her present position."  SCR 60.06(2)(c).   Plaintiff contends that the rule prohibiting party membership prevents him from exercising his First Amendment rights to associate and express his political viewpoints, California Democratic Party v. Jones, 530 U.S. 567, 574 (2000), and that the code's restrictions on that right are subject to strict scrutiny because they prohibit speech on the basis of content.  E.g., Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 658 (1994) (laws that restrict content of speech by subset of speakers "demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)").

### 1. Standard of review

Under a strict scrutiny analysis, defendants have the burden of showing that SCR 60.06(2)(b)1 is narrowly tailored to further a compelling state interest by the least restrictive

13

means.  Johnson v. California, 543 U.S. 499, 505 (2005); United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 813 (2000).  Defendants do not address plaintiff's position that strict scrutiny is the proper standard of review, but seem to concede that plaintiff is correct by structuring their briefs to follow a strict scrutiny analysis.  See also White II, 416 F.3d at 748-49 (applying strict scrutiny to restriction on partisan activities of judges and judicial candidates); Carey v. Wolnitzek, 2008 WL 4602786, *5 (E.D. Ky. 2008) (same).

On the other hand, defendants go to some length to distinguish this case from White I on the ground that, unlike the rule at issue in White I, SCR 60.06(2)(b)1 "does not limit a candidate's ability to conduct an effective campaign."  Dfts.' Br. at 17, dkt. #49.  This suggests that defendants believe that the standard of review should be something less than strict scrutiny.  In particular, defendants say that Minnesota's rule prevented candidates from talking about "issues" while the Wisconsin rule "address[es] the qualifications for serving in a position, which is an area where the government has traditionally had wide discretion."  Id. at 9 (citing Moss v. Martin, 473 F.3d 694 (7th Cir. 2007)).  In addition, defendants say that plaintiff has admitted that the rules do not interfere with his campaigning because he has testified that he does not want "to appeal to overheated rhetoric in a partisan nature."  Dfts.' PFOF ¶ 53, dkt. #58.

Despite defendants' efforts to distinguish this case from White I, they do not explain

14

how their observations are relevant to determining the constitutionality of SCR 60.06(2)(b)1. Any differences between this case and <u>White I</u> are unimportant unless those differences point to a different result. If the standard of review is strict scrutiny, as defendants appear to concede, it makes no difference whether plaintiff wishes to join a political party to further his campaign or for more personal reasons. The only relevant question would be whether defendants can show that the rule against doing so is narrowly tailored to further a compelling state interest.

I do not understand defendants to be arguing that the court should apply a more deferential standard of review because plaintiff's speech is unrelated to his campaign. Even if that is their argument, it is unlikely that they could prevail on it. First, even if party membership had no relevance to a judicial campaign, it does not follow necessarily that a different standard of review would apply. The general rule is that *any* content-based restriction on speech is subject to strict scrutiny. <u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525, 574 (2001) ("We have consistently applied strict scrutiny to such content-based regulations of speech."). Second, plaintiff did not say that he would be silent about his political affiliation during campaigns; he said that he wants to identify himself as a Democrat in candidate questionnaires.

Plaintiff's personal reasons for wanting to join the Democratic Party or to announce his affiliation with the party are irrelevant under <u>White I</u>. Although the Court emphasized

15

that Minnesota's rule prohibited speech in the context of political campaigns, the issue for the Court was not whether the rule allowed the candidate "to conduct an effective campaign," but whether Minnesota was preventing candidates from giving voters information they might find relevant in making their choice.  White I, 536 U.S. at 782 ("We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.") (internal quotations and citations omitted). Arguably, a candidate's political affiliation communicates as much or more information to a voter than that candidate's stance on any one issue.  Although it may be an overstatement to say that party membership is "shorthand for the views a judicial candidate holds," White II, 416 F.3d at 754, it is certainly a piece of information that many voters would be interested in knowing, "for the obvious reason that" they believe "it reflects how the person will likely decide cases."  Erwin Chemerinsky, Restrictions on the Speech of Judicial Candidates Are Unconstitutional, 35 Ind. L. Rev. 735, 738 (2002).  This is no doubt why "Presidents have always used ideology as one criteria in selecting judges."  Id.

One might argue that even if a candidate's political affiliation is informative, it is not a "relevant" consideration for voters in a judicial election because party preference is not something that *should* have any bearing on how a judge decides a case.  Defendants hint at this view when they say that the difference between SCR 60.06(2)(b)1 and Minnesota's rule is that the Wisconsin rule is aimed at the qualifications for service.  In other words, the

16

government should have the authority to decide the proper qualifications for a judge and, concomitantly, what information about the candidate that the voters may consider.

Such a view cannot prevail in light of <u>White I</u>, 536 U.S. at 774, which holds that the government does *not* have discretion to restrict "speech about the qualifications of candidates for public office," because "'[i]t is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign.'" <u>Id.</u> at 782 (quoting <u>Brown v. Hartlage</u>, 456 U.S. 45, 60 (1982)).  In other words, in an election, it is the voters, not the government, who determine whether particular information about a candidate is a relevant consideration in casting their votes; the government does not have unrestrained authority to restrict candidates' speech in order to insure that voters consider only the "correct" criteria.  <u>Buckley v. Valeo</u>, 424 U.S. 1, 57 (1976) ("In the free society ordained by our Constitution it is not the government but the people . . . who must retain control over the quantity and range of debate on public issues in a political campaign."); <u>Mills v. Alabama</u>, 384 U.S. 214, 218 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.  This, of course, includes discussions of candidates.")  In this respect, it is difficult to see how Wisconsin's rule of prohibiting judges and candidates from identifying themselves as a member of a political party is any different from Minnesota's rule of prohibiting candidates

17

from announcing their views on "disputed . . . political issues." Id. at 770 (quoting  Minn. Code of Judicial Conduct, Canon 5(A)(3)(d)(i) (2002)).

In another attempt to show that strict scrutiny is not the applicable standard of review, defendants cite Garcetti v. Ceballos, 547 U.S. 410, 418 (2006), for the proposition that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedoms."  They also cite United States Civil Service Commission v. National Association of Letter Carriers, AFL-CIO, 413 U.S. 548, 579 (1973), in which the Court upheld provisions in the Hatch Act that restricted the political activity of certain public employees.  Defendants may mean to suggest that the court should apply a test similar to the one in Pickering v.  Board of Education of Township High School District 205, Will County, 391 U.S. 563 (1968), which provided the standard of review for both Letter Carriers and Garcetti.   Under Pickering, courts do not apply strict scrutiny but a more straightforward balancing of a public employee's right to speak out on matters of public concern against the government's interest in "promoting the efficiency of the public services it performs through its employees." Letter Carriers, 413 U.S. at 564 (quoting Pickering, 391 U.S. at 568).

The Pickering standard does not provide a good fit in the context of this case.  The reason for the more limited review in Pickering relates to the government's status as an employer and the traditional control that employers have over their employees.  The

18

government would be unable to provide services effectively and efficiently if federal courts routinely questioned "the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."  Connick v. Myers, 461 U.S. 138, 147 (1983). However, it is difficult to characterize an elected judge as a mere "employee" of the government or any discipline of that judge as a "personnel decision."  It is the people rather than the government who decide ultimately whether any judge's performance is satisfactory.

Further, the Court has stated that the Hatch Act and the decision in Letter Carriers were targeted not at restricting but "*protect[ing]* employees' rights, notably their right to free expression," United States v. National Treasury Employees Union, 513 U.S. 454, 471 (1995) (emphasis added), by keeping higher ranking officials from making "advancement in the Government service . . . depend on political performance."  Letter Carriers, 413 U.S. at 566.  See also Elrod v. Burns, 427 U.S. 347, 366-67 (1976) ("Legislative restraints on political management and campaigning were also upheld in Letter Carriers . . . because they served to protect individual belief and association and, thereby, the political process.") Thus, it would appear that the rationale of Letter Carriers is largely inapplicable in cases in which the government's purpose is solely to limit speech rather than preserve it.

In a concurring opinion in White I, 536 U.S. at 796, Justice Kennedy left open the question "[w]hether the rationale of [Pickering] could be extended to allow a general speech restriction on sitting judges—regardless of whether they are campaigning—in order to

promote the efficient administration of justice." The majority did not distinguish between candidates and sitting judges; its focus was whether the speech was made in the context of a campaign. In any event, to the extent such a distinction may be relevant, Justice Kennedy's question will have to remain open because SCR 60.06(2)(b)1 is not limited to sitting judges. To the extent any distinction between "campaigning judges" and "noncampaigning judges" is appropriate, such a distinction may have little meaning in a state like Wisconsin, which does not impose term limits on judges. Thus, in a sense, state judges in Wisconsin are *always* campaigning, at least until they decide to retire.

Finally, defendants raise the question whether SCR 60.06(2)(b)1 is entitled to "a strong presumption" that it is constitutional because it is part of a "universal and long-established tradition." White I, 536 U.S. at 785 (citing McIntyre v. Ohio Elections Commission, 514 U.S. 334, 375-77 (1995)). See also Letter Carriers, 413 U.S. at 557 (upholding political restrictions on public employees in part because of tradition extending back to Thomas Jefferson that such employees should not be involved in politics). I cannot conclude that such a presumption is applicable in this case. It is true that at the turn of the century, the Wisconsin legislature changed the nomination process and the ballots in judicial elections from partisan to nonpartisan. However, that is not the "tradition" implicated by this case. Plaintiff is not trying to force the state of Wisconsin to place his political party next to his name on the ballot or change anything else about the way the state structures

20

judicial elections.  He wants to join a political party, a practice the legislature has never prohibited and that Wisconsin's judicial code of conduct did not prohibit until 1968.

In White I, 536 U.S. at 786, the Court declined to apply the presumption of constitutionality in the face of a showing that not only did the first model code of conduct published by the American Bar Association in 1924 contain a provision similar to Minnesota's rules restricting judicial candidates from taking positions on legal and political issues, but at the time White I was decided, all but four states holding judicial elections had a similar provision.  Id. (stating that practice of prohibiting announcement of positions on legal issues was "relatively new to judicial elections").  Thus, Wisconsin's even more recently adopted prohibition on party affiliation cannot be deemed a "long-standing tradition" under White I.  Id. at 786 (noting that until later part of 20th century, "not only were judicial candidates (including judges) discussing disputed legal and political issues on the campaign trail, but they were touting party affiliations and angling for party nominations all the while").

Finally, nothing in the record shows that any state other than Wisconsin prohibits judges and judicial candidates from becoming members of political parties, making it impossible to argue that the restriction is "universal."  It is unlikely that most states impose such a limitation on judges.  None is included in the ABA's model code, which contains a number of rules regarding political activities, but no flat prohibition on party membership.

21

American Bar Association, Model Code of Judicial Conduct, Canon 4 (2007).  See also C. Scott Peters, Canons, Cost and Competition in State Supreme Court Elections, 91 Judicature 27 (listing six states other than Wisconsin that prohibit partisan political activities for judicial candidates).  Accordingly, I conclude that SCR 60.06(2)(b)1 is not entitled to a presumption of constitutionality and that the appropriate standard of review is strict scrutiny.

Once it is determined that strict scrutiny is the proper standard of review, it becomes difficult for defendants to show that SCR 60.06(2)(b)1 is constitutional.  It "is the rare case in which . . . a law survives strict scrutiny." Burson v. Freeman, 504 U.S. 191, 211 (1992); see also North Dakota Family Alliance, Inc. v. Bader, 361 F. Supp. 2d 1021, 1041 (D.N.D. 2005) (questioning "[w]hether the decision in White[I] left any room for the regulation of the speech of judicial candidates").

2. Identifying a compelling state interest

As White I showed, it is not easy to determine the contours of the compelling state interest that the restrictions on judicial candidates and judges are intended to advance.  It is not enough to say that "nonpartisan elections" are the goal; it is necessary to focus on what values nonpartisan elections advance.  Even saying that the ultimate goal is an impartial judiciary is not enough, as White I made clear.  As the Court pointed out in that

22

case, impartiality can refer to at least three different concepts:  (1) the lack of bias for or against any party to a proceeding, which "guarantees a party that the judge who hears his case will apply the law to him in the same way it applies it to any other party," White I, 536 U.S. at 776; (2)  the lack of preconception in favor of or against a particular legal view, id. at 777 (a kind of "impartiality" that is neither likely to be found in persons capable of being judges nor necessary to the administration of justice, id. at 777-78); and (3) openmindedness in the sense of being willing to consider views that oppose one's own preconceptions and remain open to persuasion.  Id.  The Supreme Court was willing to concede that the third type of impartiality might be desirable, but it was persuaded that the Minnesota canon was not adopted to further that kind of impartiality, given the small number of public statements judicial candidates make in the course of a political campaign compared to those they make in their careers as judges or as lawyers or law professors before becoming judges.

In the context of this case, the interests advanced by Wisconsin's prohibition on announcing one's political party can be defined as (1) the absence of bias toward particular political parties that appear before the court or toward litigants who are members of a political party; and (2) the absence of improper influence by a political party or a political party's ideology.  Added to these is the public's *perception* that judges are not biased or influenced by these improper influences.  Shirley S. Abrahamson, Thorny Issues and Slippery Slopes, Ohio St. L. J. 3, 3 (2003) ("Although the phrase is hard to define, the term

23

'judicial independence' embodies the concept that a judge decides cases fairly, impartially, and according to the facts and law, not according to whim, prejudice, or fear, the dictates of the legislature or executive, or the latest opinion poll.")


3. Determining whether any compelling interests are furthered by SCR 60.06(2)(b)1

No one can doubt that states have a compelling interest in trying to insure that judges decide cases on the basis of the law and not because of a relationship with an outside influence.  As defendants observe, "[t]he impartial judge is the essence of due process and the keystone of our concept of justice."  Dfts.' Reply Br. at 1, dkt. #61.  See also White I, 536 U.S. at 793 (Kennedy. J., concurring) ("Judicial integrity is . . . a state interest of the highest order."); Buckley v. Illinois Judicial Inquiry Board, 997 F.2d 224, 227 (7th Cir. 1993) ("Justice under law is as fundamental a part of the Western political tradition as democratic self-government.")  Acknowledgment of the importance of that interest in this country goes back at least as far as the Declaration of Independence, in which Jefferson condemned the British king because he "made judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries."

To acknowledge the great importance of an interest is not to give the government a free pass on showing that the interest is implicated by the restriction. Nixon v. Shrink Missouri Government PAC,  528 U.S. 377, 392 (2000) ("We have never accepted mere

24

conjecture as adequate to carry a First Amendment burden."). The question in this case is whether "partisan" is a fair proxy for "partial," or "biased" or, stated another way, whether allowing judges and judicial candidates to join a political party will make it more likely that in fact or as perceived by the public, judges will decide cases on the basis of their political affiliation rather than their view of the law.

a. Bias toward particular litigants

At first look, it might appear that SCR 60.06(2)(b)1 furthers the state's interest in preventing bias or its appearance when a political party or closely associated person or entity appears as a litigant in a judge's court. After all, it has long been recognized that "no man is permitted to try cases where he has an interest in the outcome." In re Murchison, 349 U.S. 133, 136 (1955).

Although the issue is subject to debate, one might argue that even when no money or personal relationship is involved, a judge may appear to have an "interest" in a case in which one of the litigants is a group to which he belongs. American Bar Association, Model Code of Judicial Conduct, Rule 2.11(A) (2007) ("A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned.") But see White II, 416 F.3d at 755 ("[T]he fact that the matter comes before a judge who is associated with the Republican or Democratic Party would not implicate concerns of bias

25

for or against that party unless the judge were in some way involved in the case beyond simply having an "R" or "D," or "DFL" (denoting Minnesota's Democratic-Farmer-Labor Party) after his or her name."); <u>Florence County Democratic Party by Moore v. Johnson</u>, 314 S.E.2d 335 (S.C. 1984) (recusal not required just because judge had been affiliated with litigant political party before becoming judge).

Assuming that the government has a compelling interest in keeping judges from deciding cases in which their own political party is a litigant, a closer inspection of SCR 60.06(2)(b)1 reveals that it does nothing to further that interest.  In fact, the rule may actually hinder the interest in preventing bias.

An assumption that SCR 60.06(2)(b)1 prevents potential bias in favor of a political party rests on another assumption:  that invalidating the rule will create political preferences where none existed before.  This would be true only if invalidation meant that judges and candidates were required to join a political party.  In fact, it would merely permit those who *already have* a political preference to acknowledge it formally.  I am not prepared to make the next assumption, which is that any judge like plaintiff who has stated his desire to join a party will become any more partisan-minded simply because he registers as a Democrat.

The current rule does not eliminate potential bias, but only hides it.  One could argue that abolishing the rule *furthers* an interest in preventing biased judges from hearing cases. If those judges revealed their political affiliation, parties who thought the affiliation would

26

make the judge biased against them could move for recusal.  (An increase in motions for

recusal can present many administrative difficulties, particularly in judicial districts with only

one judge, but that is not a reason for upholding a ban against the provision of arguably

relevant information.)  As it stands now, there may be any number of state court judges who

have strong political preferences in fact, but litigants are unable to learn this information

because it is banned by the rule.

It is hard to argue that withholding the truth about a judge's or candidate's political

preferences furthers a compelling interest in reducing the *appearance* of bias for or against

particular litigants or that adopting a policy of "ignorance is bliss" is a compelling or even

legitimate way to maintain public confidence in the judiciary.  The state has no interest in

making judges appear open minded when in fact they are not.   Jerome Frank, <u>Courts on

Trial: Myth and Reality in American Justice</u> 3 (1949) ("It is a mistake . . . to try to establish

and maintain, through ignorance, public esteem for our courts.").


b.  Improper influence

In determining whether SCR 60.06(2)(b)1 furthers an interest in preventing judges

from deciding cases for partisan reasons or appearing to do so, the first step is to properly

identify the scope of the rule and plaintiff's challenge to it.  Defendants says that plaintiff

is "attack[ing] the entire nonpartisan structure of the Wisconsin judiciary," Dfts.' Br. at 8,

27

dkt. #49, but that is a significant overstatement.  It is important to note that plaintiff is not trying to force the state to place his party affiliation on the ballot; he is not asking to become a party leader or even become involved in party affairs; and he is not challenging the rule against "appeal[ing] to partisanship" in the context of an election.  SCR 60.06(2)(a). Rather, he is simply asking to be able to tell the truth about his political preference.  Thus, I need not decide whether any of those other activities might be prohibited without violating the First Amendment. The issue in this case is whether defendants' interests in a fair judiciary are implicated by allowing plaintiff to "be a member of [a] political party."  SCR 60.60(2)(b)1.  This is another distinction between Wisconsin's rule and the law at issue in Letter Carriers, 473 U.S. at 576, 579 n.21, which restricted the political activities of federal employees but permitted them to be party members and "express [an] opinion on political subjects and candidates."

Defendants have little evidence to support their contention that their interest in preventing improper influence is furthered by SCR 60.06(2)(b)1.  Spargo v. New York State Commission on Judicial Conduct, 244 F. Supp. 2d 72, 88 (N.D.N.Y. 2003) (noting "attenuated connection" between absolute prohibitions on political activity and need to prevent judicial bias).  In fact, what little evidence defendants have may support plaintiff's position rather than their own.

28

1)  Wisconsin's history of judicial elections

Defendants rely primarily on Wisconsin's own judicial history as evidence of the danger of partisan elections.  This line of argument misses the mark.  Plaintiff is not trying to change the ballot or give parties control over nominations.  Defendants predict that party membership will lead to party control, but they have neither produced any evidence nor developed an argument in support of that prediction.

Even if I consider Wisconsin's history of judicial elections, it does not help defendants' case.  Defendants argue that the danger of a partisan judiciary is shown by several controversial Wisconsin judicial elections held in the 1800s when candidates still ran under a partisan label.  For example, defendants say that Justice Crawford was not re-elected in 1855 because of a dissent in a case about the Fugitive Slave Act and that Chief Justice Dixon almost lost his campaign for re-election a few years later after a dissent in a related case.  These incidents do not support a conclusion that improper party influence led to a particular outcome in a case or even to a perception of such influence.  In the case of Chief Justice Dixon, he voted *against* what appears to have been his party's view at the time.  Rather, what these incidents suggest is that whether elected judges are partisan or nonpartisan, they may face retribution from the voters when they take unpopular stances on legal issues.  E.g., Gerald F. Uelmen, Crocodiles in the Bathtub: Maintaining the Independence of State Supreme Courts in an Era of Judicial Politicization, 72 Notre Dame

29

L. Rev. 1133, 1133 (1997) (discussing defeat of Tennessee Supreme Court Justice Penny White in nonpartisan retention election after she joined controversial decision reversing death penalty conviction).  See also White I, 536 U.S. at 782 (noting that "elected judges . . . always face the pressure of an electorate who might disagree with their rulings and therefore vote them off the bench").

Defendants point to the "informal tradition" that developed in legislative caucuses in the latter part of the 19th century to obtain a partisan balance on the court.  It is unclear how that practice could be viewed as showing the corrupting power of political parties on the court.  If anything, it suggests that when party affiliation is out in the open, efforts are made to insure that the court represents different viewpoints, which many would consider to be a positive development that would have a moderating effect on the court.  Richard A. Posner, Law, Pragmatism and Democracy 120 (2003) (acknowledging that "[v]alues . . .influence judicial decisions" and arguing that "diverse judiciary" is important to prevent ideological hegemony on courts); Stephen J. Choi and G. Mitu Gulati, Trading Votes for Reasoning, 81 S. Cal. L. Rev. 735, 739 (2008) ("[J]udges appear to moderate their voting in settings where there is potential diversity in political views.").

It appears that in the late 19th and early 20th centuries, party labels lost any significance they may have had for Wisconsin judicial candidates, even before the legislature made the elections officially nonpartisan in 1913.  In 1909, the state supreme court had a

30

Democratic majority, "despite the fact that voters consistently elected Republican governors and legislatures during this time and the Democratic party was very weak. Little attention was paid to . . . partisan affiliations of the justices, demonstrating the absolute disappearance of partisan considerations by that time." DPFOF ¶ 31, dkt. #50.

Even after judicial elections became nonpartisan in 1913, party membership was permitted until 1968. During that time, two special committees prepared reports regarding the Wisconsin judiciary. The 1915 report stated that Wisconsin judges are "retained in the service without regard to political considerations term after term" and the 1938 report stated that Wisconsin judicial elections remained "completely nonpartisan" and that "the Wisconsin judicial system is not in any dire need of change." Far from showing that party membership would doom the Wisconsin judiciary to corruption and bias, Wisconsin history suggests that a judicial candidate's political affiliation had little effect on voters' choices or judges' decision making.

The only other evidence defendants offer on the subject is the opinion of their expert, who says that Wisconsin's "judges should maintain a nonpartisan appearance and should take care not [to] be perceived as advocates of a particular party." Ranney Aff. ¶ 19, dkt. #54. Although defendants' expert may be highly qualified to testify about Wisconsin legal history, he is not an expert on public opinion or the effect on public opinion that a particular rule might have. (It is unlikely that anyone could be recognized as such an expert in the

31

context of a lawsuit.)  The sole basis for the expert's opinion is Wisconsin's judicial history, which I have concluded does not support defendants' position.

### 2) experience of other states

A dozen states employ *officially* partisan elections with respect to at least some judgeships.  American Judicature Society, "Methods of Judicial Selection" <u>available at</u> http://www.judicialselection.us/ judicial_selection/ methods /selection_of_judges.cfm?state= (last visited Feb. 6, 2009) (identifying the following states as employing partisan elections for at least some judicial offices: Alabama, Illinois, Kansas, Louisiana, Michigan, New Mexico, New York, Ohio, Pennsylvania, Tennessee, Texas and West Virginia).   Other states have nonpartisan elections but do not have Wisconsin's prohibition on party membership.  One would think that if partisan behavior in judicial elections were as detrimental to the integrity of the judiciary as defendants say, so many states would not continue to maintain that system for so long, sometimes more than 150 years.  F. Andrew Hanssen, <u>Learning about Judicial Independence: Institutional Change in the State Courts</u>, 33 J. Legal Stud. 431, 435 ("New York became the first state to use partisan judicial elections to select its high-court justices in 1847.")  Whatever the experience of these states and the probability of data about that experience, neither side has made it a part of the record.

The only information on this issue was provided by plaintiff, who cited a survey of

Minnesota residents published in January 2008, more than two years after Minnesota judges were permitted to join political parties.  Of those surveyed, 76% said they had "confidence" in Minnesota judges, compared to 66% for the governor, 58% for the state legislature, 55% for lawyers and 48% for political parties.  In addition, 78% said that the word "impartial" described Minnesota judges "very well" or "well," even though 65% said the same with respect to the word "political," suggesting that many believe the two ideas are not mutually exclusive.  Justice at Stake, "2008 Minnesota Public Opinion Poll on Judicial Selections," available at http://www.justiceatstake.org/node/15 (last visited Feb. 6, 2009).  Although defendants question the survey results, they do not point to any contrary data.

It is true that some states holding partisan judicial elections have been criticized for especially contentious elections or controversial decisions that some view as harming the judiciary's reputation.  E.g., Ferris K. Nesheiwat, Judicial Restraint, 24 Quinnipiac L. Rev. 757, 790-91 (2006) (discussing partisan Ohio Supreme Court race in 2002 involving "huge sums of money" donated by interest groups, numerous attack ads and charges of unethical behavior by the candidates).  However, there is no indication that the problems are peculiarly related to having a partisan election rather than to the election process itself or the way the campaigns were funded.  James Sample, David Pozen and Michael Young, Brennan Center for Justice, Fair Courts: Setting Recusal Standards (2008) (noting that fund raising for judicial elections between 2000 and 2004 had increased 67% from previous four years

to $123 million and concluding that, "[o]f the emerging threats to judicial impartiality and the appearance of impartiality, perhaps most fundamental is the influence of money."); Brian Troutman, Party Over? The Politics of North Carolina's "Nonpartisan" Elections, 86 N.C. L. Rev. 1762, 1781 (2008) (discussing North Carolina's recent change from partisan to nonpartisan judicial elections and concluding same problems remained while voter turnout decreased); see also White I, 536 U.S. at 789-90 (O'Connor, J., concurring) (describing threats to judicial impartiality created by "the very practice of electing judges," including "potential electoral consequences of . . . decisions" and "feeling indebted to certain parties or interest groups").

3)  Wisconsin's recent experiences with judicial elections

Wisconsin's own recent history demonstrates that a nonpartisan judiciary is no panacea for the problems of contentious elections or perceptions of bias.  E.g., Ryan J. Foley, "New panel named to hear case against Wisconsin Justice," AP Alert (October 28, 2008) (panel formed to determine whether state supreme court justice ran ad that was "deliberately misleading" by "suggest[ing his opponent] helped free a child rapist"); Dee J. Hall, "Supreme Court's newest member reprimanded over conflicts of interest," Wisconsin State Journal (May 29, 2008) (state supreme court justice reprimanded for sitting on cases involving bank for which her husband served as director); Marie A. Failinger, Can a Good Judge Be a Good

34

Politician?, 70 Mo. L. Rev. 433, 447 (Spring 2005) (noting that 75% of all cases coming before Wisconsin Supreme Court in 1990s involved lawyer, firm or company that had contributed to one or more of its justices).

With respect to the problem of campaign contributions in particular, a recent survey of 600 Wisconsin residents showed that 78% of those polled believe that such contributions have "a great deal" or "some" influence on Wisconsin judges' decisions and that 65% support public financing in judicial elections. Justice at Stake, "2008 Wisconsin Public Opinion Poll on Judicial Selections," available at http://www.justiceatstake.org/node/15 (last visited Feb. 6, 2009).  In light of the perceived influence of campaign donors, it seems almost disingenuous to say that mere party membership is the real threat.  After all, joining a party is simply a statement of belief; in itself, it does not suggest that a candidate is beholden to the party in the way that accepting a contribution does.

This brings up a related question, which is whether the gag order imposed by SCR 60.06(2)(b)1 is fooling anyone.  Many if not most judicial candidates have political lives before their judicial campaigns and often are easily identified as "Republican" or "Democrat" even if they do not explicitly run as such.  Certainly, the political parties themselves have had no difficulty picking "their" candidate in recent Wisconsin judicial elections.  Dee J. Hall, "Judicial Races More Partisan," Wisconsin State Journal (Nov. 18, 2008) available at 2008 WLNR 22059128 (noting that candidates Linda Clifford and former Justice Louis Butler

35

received substantial assistance from Democratic organizations in their campaigns while Republican Party supported now-Justices Annette Ziegler and Michael Gableman and former Justice Diane Sykes). The voters should be given at least as much credit for their ability to figure things out for themselves. Once that reality is acknowledged, it is difficult to argue that the government has a compelling interest in stopping judges and candidates from saying out loud what everyone already knows.

4)  other considerations

Whatever the cause of the problems confronting the judicial election process, it is likely that it is not because there are too few speech restrictions. In fact, after the Supreme Court held in White I that "announce" clauses are unconstitutional, "the general report on judicial campaign activity was that the rhetoric and 'attacks' were less frequent and more restrained—even though largely voluntary—than in the 2000 judicial campaign season." Ferris K. Nesheiwat, Judicial Restraint, 24 Quinnipiac L. Rev. 757, 789 (2006). The same is true regarding the public's perception of the judiciary. A recent study concluded that "the strictness of a state's code of judicial conduct does not significantly affect how impartially that state's judges are perceived," suggesting that little is to be gained from severely curtailing the First Amendment rights of judicial candidates. Benjamin B. Strawn, Do Judicial Ethics

36

Canons Affect Perceptions of Judicial Impartiality?, 88 B.U.L. Rev. 781, 785 (2008).  By limiting the information available to voters, the primary contribution of expansive speech restrictions may be nothing more than "reducing competition and protecting incumbents." C. Scott Peters, Canons, Cost and Competition in State Supreme Court Elections, 91 Judicature 27 (Jul.-Aug. 2007) ("[I]ncumbents would likely benefit from less competitive elections if ethical restrictions make it more difficult for campaigns to communicate their views to voters.")

Of course, it would be unrealistic to say that a judge's political affiliation has *no* effect on his decision making process.  For example, a Republican may be more likely to view himself as a "strict constructionist" while a Democrat may be more likely to believe in a "Living Constitution."  But to say that a judge comes to the bench with certain beliefs about the proper functioning of government does not necessarily make him unfit to serve.  As Oliver Wendell Holmes, Jr., recognized, "the life of the law" is not cold logic, but "experience," including "the felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, *even the prejudices which judges share with their fellow men.*"  Oliver Wendell Holmes, Jr., Common Law 1 (1881) (emphasis added).  It is simply not possible, or even desirable, to stamp out all the views a judge had before he took the bench and little to be gained from pretending that we can.

Many groups to which a judge belongs may have an influence on his judicial

philosophy and interpretation of the laws.  For example, in a recent book Judge Posner noted a study finding that Roman Catholic judges are 11% more likely to rule against gay rights than Protestant judges and 25% more likely to do so than Jewish judges.  Richard A. Posner, Law, Pragmatism and Democracy 120 (2003) (citing Daniel R. Pinello, Gay Rights and American Law 203).  Does this mean that Catholics (or Protestants or Jews) should be forced to recuse themselves in cases in which gay rights are at issue? Or to make the question even more similar to this case, that judges should be prohibited from religious affiliation because of the effect it might have on their decisions?  The answers to these questions are obvious.  We expect that judges will do their best to set aside their religious beliefs when deciding legal questions even if we understand that their personal experiences may inform their judgment.

As with potential bias toward particular litigants, even if one believes that a judge with a partisan preference is more likely to decide cases for partisan reasons, prohibiting him from publicly acknowledging that preference does nothing to make him more open minded. It only allows him to pretend that he is.  The best way to eliminate potential bias is to shine a light on it, not cover it up.

Similarly, any argument that a policy of openness will undermine public confidence in the judiciary is unpersuasive.  Again, it is dubious that the state has a legitimate interest in maintaining public confidence in the judiciary by concealing information.  In the context

of a democratic election, "you can't handle the truth," is rarely an adequate justification for a restriction on speech.

Further, in Wisconsin, the *voters*, not the government, have the final say regarding which judges keep their jobs. If the voters believe that a candidate who declares his party preference will erode their confidence in the judiciary, they may quickly send that message by refusing to elect him. As Justice Stevens wrote in White I, 536 U.S. at 797 (Stevens, J., dissenting), those who believe that judicial candidates are acting improperly are free to exercise their own First Amendment rights by attempting to persuade the voters of their view.

By limiting the speech available to voters, the government is taking the paternalistic view that the voters cannot be trusted to exercise their rights wisely. If that is indeed what the government believes, it has a duty to educate voters about the qualifications for judges or change its system of judicial selection. Marie Hojnacki & Lawrence Baum, Choosing Judicial Candidates: How Voters Explain Their Decisions, 75 Judicature 300, 300-02 (1992) (concluding that voting behavior depends on kind of information voters receive). The problem of an uninformed public should not be solved by depriving them of even more information than they otherwise might have. Eu v. San Francisco County Democratic Central Committee, 489 U.S. 214, 228 (1989) (any argument that government is "enhancing the ability of its citizenry to make wise decisions by restricting the flow of

39

information to them must be viewed with some skepticism").

4.  Narrow tailoring:  underinclusiveness

Even if I assumed that SCR 60.06(2)(b)1 furthered interests in reducing perceptions of bias or improper influence, the rule would still be vulnerable to a First Amendment challenge on the ground that it is underinclusive.  White I, 536 U.S. at 780 ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon . . . speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.") (Internal quotations omitted); City of Ladue v. Gilleo, 512 U.S. 43, 51 (1994) ("[T]he notion that a regulation of speech may be impermissibly underinclusive is firmly grounded in basic First Amendment principles.").  In one sense, any attempt to limit improper influence in the judiciary could be called underinclusive so long as a state continues to require judges to face re-election.  Because elected judges know that their continued employment is contingent on voter satisfaction with their performance, the potential for judicial bias or the perception of it is present any time a judge is faced with a controversial decision that may inflame a large or powerful block of voters.  White I, 536 U.S. at 789 (O'Connor J., concurring) ("Elected judges cannot help being aware that if the public is not satisfied with the outcome of a particular case, it could hurt their reelection prospects.").

The parties' discussion of underinclusiveness focuses on judges' and candidates'

40

involvement with special interest groups, which the Wisconsin Code of Judicial Conduct does not specifically prohibit.  Plaintiff says that by prohibiting party membership while leaving interest group membership unregulated, defendants have failed to protect any interest they have in preventing improper influence on judges. This perceived disparity in treatment between parties and interest groups was key to the conclusion in White II, 416 F.3d at 758, that Minnesota's prohibition on partisan activities was unconstitutional.

Defendants' response to plaintiff's charge has two parts.  First, defendants say that plaintiff is wrong about the code's failure to regulate judges' relationships with special interest groups.  According to defendants, the code *does* prohibit membership in interest groups when read carefully.  Second, defendants say that any differential treatment in the code between political parties and special interest groups is justified because parties are more "pervasive" and pose "the most critical threat" to the state's interest in judicial impartiality. Dfts.' Br. at 18-19, dkt. #49.

With respect to their first argument, defendants acknowledge that, on its face, the code is silent regarding prohibited relationships with special interest groups.  In fact, it expressly permits judges to belong to "a nonprofit educational, religious, charitable, fraternal, sororal or civic organization."  SCR 60.05(3)(c).  However, defendants cite a 2002 advisory opinion of the Judicial Conduct Advisory Committee that concluded that the code prohibited a "judge [from serving] as president of a civic, non-profit organization, a

41

substantial part of whose mission is to advocate social goals through litigation and legislative action" under provisions regarding "the appearance of impropriety," SCR 60.03, activities that might "[c]ast reasonable doubt on the judges's capacity to act impartially as a judge," SCR 60.05(1)(a), and other similarly general provisions. Second Alexander Aff., exh. Q, at 1, dkt. #51.

Defendants do not point to any Wisconsin court decisions that have adopted the committee's expansive view of the code or identify any instance in which a Wisconsin judge was threatened with discipline because of his involvement in an interest group. The opinion itself notes that it is not binding, even on the commission. Id. at 4. Interestingly, although Minnesota's code contains provisions identical to the ones cited in the committee's advisory opinion, neither the defendants nor the dissenting judges in White II defended Minnesota's partisan activities clause from a charge of underinclusiveness by arguing that interest group involvement was prohibited as well.

Even if the committee's advisory opinion represents an accurate interpretation of the code of conduct, a lack of parity still exists in the treatment of political parties and interest groups. SCR 60.06(2)(b)1 is a flat prohibition on party membership whereas the advisory opinion suggests that at most the code prohibits judges from taking leadership positions in advocacy groups because the "president is inevitably identified with [the] goals [of the group] and often serves as their advocate." Second Alexander Aff., exh. Q, at 3, dkt. #51.

42

Thus, the interpretation of the advisory opinion appears to be similar to restrictions on federal employees in the Hatch Act, which prohibit some involvement in politics but still permit employees to express their opinions or join a political party.  Letter Carriers, 473 U.S. at 576, 579 & n.21.  If anything, the advisory opinion raises the question why the judicial code of conduct does not address political involvement of judges in the same way.

This leaves defendants' alternative argument, which is that political parties are a greater threat to the judiciary than interest groups.  However, defendants have not "carried the burden imposed by [the] strict-scrutiny test to establish . . . that" political parties "are uniquely destructive of open-mindedness."  White, 536 U.S. at 781.  Instead, defendants simply cite the following discussion in McConnell v. FEC, 540 U.S. 93, 118 (2003), approving distinctions made in federal campaign finance laws between parties and interest groups:

> Congress is fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation. Interest groups do not select slates of candidates for elections.  Interest groups do not determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses.  Political parties have influence and power in the legislature that vastly exceeds that of any interest group . . .  Congress' efforts at campaign finance regulation may account for these salient differences.

The problem with relying on this passage is that none of these differences between political parties and interest groups are relevant in this case.  Even if SCR 60.06(2)(b)1 falls, political parties will not "select slates of candidates for [judicial] elections," "determine who

43

will serve on [judicial] committees" or have any other "influence and power" that "exceeds that of any interest group."  These things may loom on the horizon but they are not before the court at this time.  When and if they are, they can be addressed.  SCR 60.06(2)(b)1 is about party membership only, not party control.

If the question is one of unofficial influence, defendants have made no showing that political parties are more influential than interest groups in the context of judicial elections. White II, 438 F.3d at 760-61 (concluding that "the influence of . . . special [interest] groups is at least as great as any posed by political parties").  It may be that the opposite is true in Wisconsin, at least if one looks at the amount of campaign contributions.  Compare Patrick Marley and Stacy Forster, "Ziegler, big lobby think alike," Milwaukee Journal Sentinel (Jul. 12, 2008) (supreme court justice authored 4-3 decision siding with group that spent $2 million in support of that justice's election campaign) with Dee J. Hall, "Growing partisanship marks Wisconsin judicial races," Wisconsin State Journal (Nov. 18, 2008) (same supreme court justice received $1,000 from Republican Party during campaign); see also Scott D. Weiner, Popular Justice: State Judicial Elections and Procedural Due Process, 31 Harv.C.R.-C.L.L. Rev. 187,208 (1996) ("[S]pecial interest groups can manipulate judicial elections so that meaningful public participation is illusory."); Norman Krivosha, In Celebration of the 50th Anniversary of Merit Selection, 74 Judicature 128, 132 (1990) ("It is nearly impossible in today's costly election process to be able to garner the kind of dollars

44

necessary for statewide election without becoming identified with various interest groups.")

Membership in interest groups may be more problematic than membership in a party simply because the issues represented by interest groups are more likely to come before a court than issues related directly to a political party.  Also, interest groups often represent more extreme views than those of a political party, which is a much looser and more varied collection of view points.  <u>McConnell v. Federal Election Commission</u>, 251 F. Supp. 2d 176, 335 (D.D.C. 2003) (citing expert testimony that "[n]o other group could come close to political parties in moderating extreme views").  Thus, membership in the former is potentially a stronger indicator that the judge has made his mind up on a particular issue. <u>White II</u>, 416 F.3d at 759-60.

However, even if I assumed that partisan influence were more "pervasive" than that of interest groups, SCR 60.06(2)(b)1 is still "woefully underinclusive," <u>White I</u>, 536 U.S. at 780, because it does not prohibit candidates from accepting campaign contributions from political parties.  It is hard to conclude that the public would be more suspicious of a judge's acknowledgment, "I am a Republican," than his statement, "I was elected in part thanks to contributions from the Republican Party."  Any argument to the contrary is inconsistent with both common sense and the views of Wisconsin citizens as reflected in polls showing the perceived influence of campaign contributions on judicial decisions.

Also, I agree with plaintiff that SCR 60.06(2)(b)1 is underinclusive because it does

45

not prohibit individuals from running for judicial office regardless of a pervasively political past and it allows partisan office holders to keep their jobs even after their judicial campaign has begun.  SCR 60.06(2)(a) and (c).  Neither of these exceptions to the rule is consistent with defendants' position that any "partisan affiliations threaten public confidence regardless whether or not there is actual bias."  Dfts.' Br. at 8, dkt. #49.

The exception for previous political activity is problematic because it is implausible to suggest that a life long political leader is less likely to be perceived as biased than someone who is simply a party member with no involvement in party affairs.  Cf. White I, 536 U.S. at 778-79 (implausible to suggest that statements made during judicial campaign more indicative of closed mind than repeated statements made before becoming candidate).  Like the exception for past political involvement, the exception for candidates with partisan jobs is an understandable acknowledgment that many qualified candidates for judicial office will come from the political arena.  It may be that defendants believe that the public is likely to understand that employment by a political party does not necessarily mean one is biased in favor of that party.  However, if that is so, it is an acknowledgment that mere *association* with a political party is not the problem.  At most, defendants' interests are implicated when a judge or candidate appeals to partisan interests during a campaign or otherwise, but that interest is covered by a separate rule, SCR 60.06(2)(a), that is not being challenged in this case.

46

5. Least restrictive means

Finally, SCR 60.06(2)(b)1 fails strict scrutiny because defendants have failed to show that it is the least restrictive means the state could use to accomplish its legitimate goals. Playboy Entertainment Group, Inc., 529 U.S. at 813. To the extent the state wishes to eliminate partisan bias or its appearance in judicial decisions, the code of conduct includes rules tailored to address these concerns. E.g., SCR 60.03(2) ("A judge may not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment."). Defendants have not explained why these narrower rules are insufficient to meet their concerns.

Further, defendants have failed to show that strong recusal standards are not a satisfactory alternative for preventing judges from deciding cases in which they may be biased or appear to be. Michelle T. Friedland, Disqualification or Suppression: Due Process and the Response to Judicial Campaign Speech, 104 Colum. L. Rev. 563, 570 (2004) (arguing that "the possibility of this less-speech-restrictive alternative suggests that even the narrowest content-based prohibitions on truthful judicial campaign speech may be unconstitutional"). A state "may adopt recusal standards more rigorous than due process requires, and censure judges who violate these standards." White I, 536 U.S. at 794 (Kennedy, J., concurring); see also Thomas R. Phillips & Karlene Dunn Poll, Free Speech for Judges and Fair Appeals for Litigants: Judicial Recusal in a Post-White World, 55 Drake L.

47

Rev. 691 (2007).  Because the vast majority of cases do not raise partisan issues, a requirement for recusal in those cases that do would be a more narrowly tailored way to further the government's interests and would not impose an undue administrative burden on the judiciary.  White II, 416 F.3d at 755.  (I need not decide whether recusal actually would be required in any particular case, only whether recusal would be sufficient to satisfy any interest that defendants may have in an impartial judiciary.)

Defendants make only weak objections to the viability of recusal as an alternative in an appropriate case.  First, they say that recusal is impractical because political parties and party officials are "frequent" litigants, but they cite only five Wisconsin cases from the last six years in which that is true.  Dfts.' Br. at 7 & n.2, dkt. #49.  Certainly, a judge is no more likely to receive a case involving party leaders than one involving a company in which he owns stock, but no one would suggest that judges should be prohibited from making financial investments (rather than being required to disclose those investments they do make and recuse themselves when necessary).

Second, defendants say that recusal is not a "workable" option because some counties may have only one or two judges assigned to them.  Dfts.' Br. at 21, dkt. #49.  That is a problem for many counties, but it is not one that is limited to potential partisan bias.  It is true whenever any form of bias is involved.  Taken to its logical conclusion, which would be nonsense, recusal standards should be abolished all together and replaced with prohibitions

on judges' establishing any relationship that might later create a conflict.   In any event, the Wisconsin legislature has determined that recusal *is* an appropriate method of addressing potential judicial bias, Wis. Stat. § 757.19.

Of course, if all or most judges joined political parties in the absence of SCR 60.06(2)(b)1, using recusal as a solution to potential conflicts might become more difficult in those few cases in which a political party was a litigant or a partisan issue was the focus of the lawsuit.  However, defendants make no showing that such a scenario is likely. Judicial candidates have an interest apart from the ethical canons in disassociating themselves from partisan groups or extreme positions lest they be deemed by the community to be too political.  Matter of the Amendment of Supreme Court Rules at 17 (Prosser, J., dissenting) ("[T]he public tends to re-elect judges who wage nonpartisan or bipartisan campaigns and who conduct themselves without partisanship in office."); Geri L. Dreiling, "Pick and Choose Judicial Candidates Defeated," ABA Journal E-Report (June 9, 2006) (discussing defeat of four Republican judicial candidates in Alabama who were defeated after "endors[ing] the notion that a state court judge need not follow Supreme Court precedent if he or she deems it clearly erroneous"). This view is supported by the lack of any evidence that Wisconsin judges embraced party labels between 1913 and 1968, when elections were officially nonpartisan but party membership was still allowed.

Recusal might become a less practical solution if it were extended to any case in which

one of the litigants was simply a member of the same political party as the presiding judge, but there could be no serious argument that such a sweeping prophylactic would be necessary.  <u>E.g.</u>, <u>Perry v. State</u>, 585 N.E.2d 715 (Ind. Ct. App. 1992) (trial judge not required to recuse herself in robbery prosecution merely because judge and alleged robbery victim were both candidates on same political party slate); <u>Sears v. Olivarez</u>, 28 S.W.3d 611 (Tex. Ct. App. 2000) (recusal not required when litigant's lawyer was running for office on political party other than that of judge); <u>cf.</u> <u>Kozuszek v. Brewer</u>, 546 F.3d 485, 490 (7th Cir. 2008) (stating that it does not "mak[e] sense" to believe that "a party member aggrieved by an election can successfully sue under section 1983 simply because a rival party administered the election").  Further, it is unlikely that in the vast majority of cases the judge will have reason to know a litigant's political affiliation, if any.

In sum, SCR 60.06(2)(b)1 is unconstitutional because it does not further any compelling state interests.  Even if it did, it would not pass strict scrutiny because it is not narrowly tailored and there are less restrictive means available to accomplish any legitimate goals.


### B.  <u>SCR 60.06(2)(b)4: Endorsement of Partisan Candidates</u>

Supreme Court Rule 60.06(2)(b)4 says that "[n]o judge or candidate for judicial office or judge-elect may . . . [p]ublicly endorse or speak on behalf of [a political party's]

50

candidates or platforms." Endorsements of nonpartisan candidates are permitted. Because plaintiff seeks to endorse partisan candidates but says nothing about endorsing a political party's "platform," I do not consider the constitutionality of that part of the rule.

1. Justiciability

In an order dated November 7, 2008, I noted that in plaintiff's summary judgment materials, Barack Obama was the sole candidate that plaintiff said he wished to endorse. Because Obama has now won the presidential election, I asked plaintiff to address the question whether his challenge to SCR 60.06(2)(b)4 was still justiciable. Renne v. Geary, 501 U.S. 312, 321 (1991) (when alleged First Amendment injury is inability to endorse candidate, claim may not be justiciable unless plaintiff can point to "particular candidate" he wishes to endorse in future).

In his response to the order, plaintiff says that his challenge to the rule remains justiciable for two reasons. First, he says that he would like to support Governor Jim Doyle in the 2010 Wisconsin gubernatorial election and President Obama in the 2012 presidential election. The problem with these proposed endorsements is that plaintiff has adduced no evidence that either candidate has announced his candidacy for these upcoming elections or has indicated his intentions to do so. Plaintiff cannot endorse a nonexistent candidate.

Nevertheless, I am persuaded by plaintiff's second argument, which is that his claim

51

remains justiciable because it is "capable of repetition yet evading review." Davis v. Federal Election Commission, 128 S. Ct. 2759, 2769 (2008).  This doctrine allows judges to decide claims even though they may be technically moot when (1) the activity in dispute begins and ends more quickly than the typical lawsuit and (2) a "reasonable expectation" exists that the plaintiff will engage in the same conduct again.  Lewis v. Continental Bank Corp., 494 U.S. 472, 481 (1990).  Both the Supreme Court and the Court of Appeals for the Seventh Circuit have recognized that an election cycle fits within the first part of this test, Moore v. Ogilvie, 394 U.S. 814, 816 (1969); Buckley, 997 F.2d at 226, and plaintiff has satisfied the second part by stating his intention to run for reelection in 2011 and endorse partisan candidates in the future.  Accordingly, I conclude that it is proper to decide plaintiff's claim challenging SCR 60.06(2)(b)4.

2. Constitutionality

In its present form, SCR 60.06(2)(b)4 falls for essentially the same reasons as SCR 60.06(2)(b)1.  Again, defendants do not seriously challenge plaintiff's contention that strict scrutiny is the appropriate standard of review because the rule represents another content-based restriction on political speech.  In their reply brief, defendants say that no "'core' First Amendment right [is] at stake" because "[p]laintiff has provided no evidence that it is a necessary or integral part of his candidacy for him to be able to make partisan

endorsements." Dfts.' Reply Br. at 9, dkt. #61.

Defendants' argument rests on the same mistaken assumption underlying their view of the party membership issue, which is that plaintiff's right is contingent on what is necessary to run an "effective" campaign. As plaintiff points out, voters could consider the type of candidates he endorses in evaluating the type of judge he is likely to be. And even if his endorsements did not have a significant impact on his own election, it would still be speech made "in the course of a political campaign" for the other candidate, which is enough under White I, 536 U.S. at 782, to trigger strict scrutiny.

Defendants' asserted interests in SCR 60.06(2)(b)4 appear to be similar to the interests underlying SCR 60.06(2)(b)4: (1) preventing bias and its appearance in favor of the endorsed candidate; (2) preventing bias and its appearance in favor of the endorsed candidate's political party or ideology. The problems with relying on these interests are similar as well. Like the prohibition on party membership, the prohibition on endorsements of partisan candidates can only mask a preference that a judge already has for a particular candidate. Forcing the judge to remain silent about his preference does not make his preference go away.

To the extent defendants mean to argue that making the preference public also makes its likely effect on the judge's rulings stronger, the Supreme Court rejected that view with respect to statements on legal and political issues in White I, 536 U.S. at 780, and it is even

53

less plausible in the context of an endorsement. Although making an endorsement suggests that the speaker believes the candidate is qualified for office, there is no reason to believe that a judge would feel obligated to rule a particular way as a result of the endorsement. After all, an endorsement does not create any sense of indebtedness; the judge is presumably giving a benefit rather than receiving one.

Defendants do not argue that it is improper for a judge to use the visibility and prestige of her office to make an endorsement. This would be a strong argument were in not for the fact that judges *are* allowed to make endorsements at present, although they are restricted to endorsing judicial candidates. If defendants were concerned about the potential bias generated by endorsements, one would think that they would ban all endorsements rather than just those of partisan candidates. Whatever bias an endorsement creates in favor of a particular person, defendants identify no reason why the bias would be greater if that person ran with a party label. This suggests that defendants' concern is not bias in favor of an individual, but only bias in favor of the candidate's political party.

Any concern about general partisan bias is even more attenuated with respect to an endorsement than it is for party membership. Defendants' argument is that if plaintiff says, "I endorse Barack Obama," plaintiff is really saying, "I will decide cases on the basis of the Democratic Party's ideology rather than the facts and law of the case." That makes little sense. After all, a judge may decide to endorse a partisan candidate for any number of

54

reasons, many of them unrelated to the candidate's party.  If defendants are concerned that a judge will begin indiscriminately endorsing candidates of a single party in order to communicate to the voters that he has strong partisan ties, that would likely fall under the rubric of the prohibition on "appealing to partisanship," SCR 60.06(2)(a), which plaintiff is not challenging.

Like the party membership prohibition, SCR 60.06(2)(b)4 is significantly underinclusive. It prohibits a judge from making partisan endorsements while allowing her to accept campaign contributions from partisan groups, which creates at least as great of an effect on a candidate as an isolated endorsement.  Robert B. Cialdini, Influence 19-51 (2001) (discussing studies showing that people feel psychological compulsion to return favors received, even when favor is uninvited or from someone disliked, and arguing that so-called "reciprocity rule" applies to campaign contributions).

In general, any concerns about bias in favor of the partisan candidate may be resolved easily through recusal in the highly unlikely event that a candidate endorsed by a judge appears in the judge's court.  Defendants say that recusal would be impractical because it would extend far beyond the particular candidate to anyone associated with that candidate. For example, defendants say that in the case of an endorsement of a candidate for governor, a judge would have to recuse himself from any case involving an administrative agency of the candidate he endorsed.  That goes well beyond what ordinary principles of recusal would

55

require.  Using defendants' standard would mean that federal judges appear biased any time they sit on a case involving an agency of the President who appointed them.  If that is so, there are few federal judges on the bench who have not been guilty of judicial misconduct.

In the case of local candidates, however, other concerns might arise.  An endorsement of a candidate for sheriff or district attorney in a close and contentious race might make recusal necessary in so many cases that the state may be able to show  a compelling interest in prohibiting such endorsements.  Wersal v. Sexton, 2009 WL 279935, *10 (D. Minn. Feb. 4, 2009).  I express no opinion on what form such a prohibition would have to take to pass constitutional muster other than to say that it must be shown to serve an identified compelling state interest.

Defendants cite a number of state court decisions that have upheld general estrictions on endorsements of partisan candidates by elected judges, but none is persuasive.  Missing from these decisions is any attempt to explain *how* the restriction furthered interests in eliminating bias or why recusal could not meet the state's interest.  In the Matter of William A. Vincent, Jr., 172 P.3d 605, 608 (N.M. 2007); In re Raab, 793 N.E.2d 1287, 1297 (N.Y. 2003); In re Code of Judicial Conduct (Canons 1, 2, and 7A(1)(b)), 603 So. 2d 494, 497 (Fla. 1992).

Accordingly I conclude that, like the prohibition on party membership, the present prohibition on all partisan endorsements cannot withstand strict scrutiny.  That portion of

SCR 60.06(2)(b)4 violates the First Amendment.


### C.  SCR 60.06(4): Personal Solicitation

Under SCR 60.06(4),

[a] judge, candidate for judicial office, or judge-elect shall not personally solicit or accept campaign contributions. A candidate may, however, establish a committee to solicit and accept lawful campaign contributions. . . . A judge or candidate for judicial office or judge-elect may serve on the committee but should avoid direct involvement with the committee's fundraising efforts. A judge or candidate for judicial office or judge-elect may appear at his or her own fundraising events.

Thus, like most other states with elected judges, Wisconsin does not prohibit judges and judicial candidates from fund raising, but instead requires all campaign solicitations to be made by a committee rather than by the candidate himself.

Again, defendants appear to agree with plaintiff that, like SCR 60.06(2)(b)1 and 4, SCR 60.06(4) is subject to strict scrutiny. White II, 438 F.3d at 764;  Weaver v. Bonner, 309 F.3d 1312, 1319 (11th Cir. 2002). With respect to the asserted compelling interest for the rule, defendants do not attempt to justify it as necessary to preserve impartiality or public confidence in the judiciary.  This may reflect a realization that a committee does little to counteract any perception that the public may have regarding improper donor influence, as several courts have recognized.  E.g., Weaver, 309 F.3d at 1322; Kansas Judicial Watch v. Stout, 440 F. Supp. 2d 1209, 1237 (D. Kan. 2006); Carey,  2008 WL 4602786, at *15.

Instead, defendants say that the restriction serves the interest "that no person feel directly or indirectly coerced by the presence of judges to contribute funds to judicial campaigns." Dfts.' Br. at 27, dkt. #49.

The first question raised by defendants' reliance on this interest is whether it can be deemed "compelling" for the purpose of a strict scrutiny analysis. No one can doubt that the government has a compelling interest in stopping *actual* coercion from taking place, but SCR 60.06(4) goes well beyond that. It is somewhat peculiar to say that *asking a question* is an evil requiring government intervention, particularly in the context of a campaign that requires such questions to be asked. Although it may be true that it is harder to say no to a campaign request (or anything else) in a face-to-face confrontation, the parties agree that the meaning of "personally solicit" extends even to the judge's signature on a fund raising letter. Defendants point to no other context in which Wisconsin has determined that potential donors need this level of protection from a candidate and they do not suggest that judicial candidates are uniquely predatory compared to others soliciting campaign contributions.

Defendants say that any comparison between judges and other types of political candidates "misses the mark" because the public "expects" legislators to be partisan. Dfts.' Reply Br. at 12, dkt. #61. This response does not help defendants because it is related to an interest defendants are not relying on to justify the restriction. Defendants are relying

58

solely on an interest in preventing a perception of coercion; they are not suggesting that personal solicitations are more likely than committee solicitations to convey partisan bias. It is difficult to see how they could make such an argument even if they wanted to.

Defendants may mean to say that a campaign solicitation from a judicial candidate is more coercive because of the possibility that the potential donor will find herself in that candidate's court after he is elected.  If that is so, defendants give no reason to believe that the problem is solved by the use of campaign committees.  As plaintiff and other courts have pointed out, a campaign committee does not stop a candidate from discovering who donated and who did not, rendering illusory any belief by the potential donor that he is freer to say no to the committee than to the candidate himself.  Weaver, 309 F.3d at 1322-23; Carey, 2008 WL 4602786, at *16.  Further, defendants provide no reason to believe that committees are any less coercive than candidates in practice.  E.g., Sara Mathias, Am. Judicature Soc'y, Electing Justice: A Handbook of Judicial Election Reforms 47, 54 (1990) (describing incident in which trial judge's campaign committee called President of Florida Bar Association one day before he was scheduled to appear before judge, thanking him for his endorsement but noting that no check was enclosed with letter).

Defendants switch gears again when they quote Justice O'Connor's concern that "the mere possibility that judges' decisions may be motivated by the desire to repay campaign contributors is likely to undermine the public's confidence in the judiciary."  Dfts.' Br. at 27,

dkt. #49 (quoting White I, 536 U.S. at 790 (O'Connor, J., concurring)).  Justice O'Connor's concern was not about a candidate's coercive effect on a potential donor, but a donor's potentially corrupting influence on the candidate.  Moreover, her criticism was not of personal solicitations in particular but judicial fund raising generally.  If defendants' worries are related to the effect of campaign contributions on the whole, the way in which a candidate makes requests for funds will not alleviate those fears.  Only a system of public financing or a change in the method of judicial selection could do that.

Defendants cite In re Dunleavy, 838 A.2d 338 (Me. 2003); Stretton v. Disciplinary Bd. of Supreme Court of Pennsylvania, 944 F.2d 137 (3d Cir. 1991); and In re Fadeley, 802 P.2d 31 (Or. 1990), each of which raises the similar concern that a personal solicitation will look more like a quid pro quo than a solicitation through a committee.  Again, defendants' reliance on these cases is puzzling because they have not identified "appearances" as the reason for the restriction.  In any event, the reasoning in these cases appears to be another example of failing to give the voters enough credit.  Although lawyers are notorious for creating legal fictions, the public is more likely to call a spade a spade.  To the extent judicial fund raising undermines confidence in the judiciary, it is a result of judges' deciding cases involving those to whom the judge is financially indebted and may be again at the next election cycle.  Neither defendants nor the cases they cite identify any reason to believe that voters are less suspicious of such a relationship simply because the contribution request is

60

signed by the committee chairman rather than the candidate.

In the end, it appears that SCR 60.06(4) furthers no interest at all, except perhaps one of saving judicial candidates from the unseemly task of asking for money. Stretton, 944 F.2d at 145 (calling process of judicial fund raising "unseemly situation").  There is almost a nostalgic quality about it, harkening back to the days of early America when candidates for office thought it was in bad taste to campaign on their own behalf, instead letting their surrogates do all the dirty work.  Joseph Ellis, Founding Brothers 174 (2002) (noting Thomas Jefferson as extreme example:  when "Jefferson's candidacy for the presidency [in 1796] was common knowledge throughout the country, Jefferson claimed to be completely oblivious to the campaign on his behalf").  For a somewhat more cynical view, see Marie A. Failinger, Can a Good Judge Be a Good  Politician?, 70 Mo. L. Rev. 433, 440-41 (Spring 2005) (noting view that many judicial ethical canons are "merely designed to enforce the upperclass virtue of politeness . . .  and protect a candidate from scrutiny").

Whatever the motivating force behind SCR 60.06(4), it does not pass constitutional muster.  If defendants believe that some potential donors will feel coerced because they are likely to appear before that judge, less restrictive (and more effective) responses would include limiting solicitations of those who are frequent litigants or requiring recusal when anyone who was solicited appears in that judge's court.

It cannot be denied that judicial campaigns have changed dramatically in recent years

as a result of increased fund raising, a change that many judicial observers believe has not been for the better.  E.g., Phyllis Williams Kotey, Public Financing for Non-partisan Judicial Campaigns, 38 Akron L. Rev. 597, 608 (2005) ("Campaigns that must be financed from funds raised by the candidate . . . raise the dangers of actual quid pro quo arrangements or at least the appearance that the judge may be improperly influenced.").  However, the problems created by costly and contentious judicial campaigns are left unaddressed by SCR 60.06(4).  It too must fall as being inconsistent with the right to free speech.


### D.  Conclusion

As White, its progeny and this case demonstrate, it is no small task to determine the best way to promote judicial integrity.  Regulatory bodies like the Wisconsin Judicial Commission must carefully weigh many competing factors in choosing a particular course, all the while being pulled in different directions by the candidates, the courts and the public. Despite the challenges, it does not follow that the government, the legal community and the general public should simply throw in the towel and adopt an "anything goes" approach.

Nor does it mean that states must abandon elections if they wish to have any meaningful influence over judicial conduct.  Although many in the legal community demonize judicial elections and exalt a system of appointment, a "merit" selection process has its own flaws and is no guarantee that the judiciary will be free from partisan bias or the

perception of it.  Cass R. Sunstein, <u>Ideological Voting on Federal Courts of Appeals: A Preliminary Investigation</u>, 90 Va. L. Rev. 301, 305 (2004) (in study of federal appellate decisions, concluding that "the political party of the appointing president is a fairly good predictor of how individual judges will vote" and that decisions are more extreme when panel is composed of three judges appointed by President of same party); Richard A. Posner, <u>Law Pragmatism and Democracy</u> 229 (2003) (discussing common perception that <u>Bush v. Gore</u> would have "come out the other way had the candidates' positions in the deadlock been reversed").  Even if it could be demonstrated that a nonelective selection process were superior, it is unlikely that the more than 30 states that use elections will abandon them any time soon.

In the wake of <u>White</u>, many reformers are advocating solutions that involve greater use of public financing, monitoring groups, voter guides, public evaluations of candidates by bar associations and even limited changes to the selection system that would allow voters to approve or disapprove a candidate immediately after appointment.  <u>E.g.</u>, David B. Rottman, <u>Conduct and Its Oversight in Judicial Elections</u>, 21 Geo. J. Legal Ethics 1295  (2008); Ferris K. Nesheiwat, <u>Judicial Restraint</u>, 24 Quinnipiac L. Rev. 757, 787-88 (2006); Derek Bok, "Too Many Beholden Judges," 26 Nat'l L.J., at A8 (Nov. 25, 2002). Whatever route the government takes, it should be hesitant in seeking to improve the judiciary by limiting the discussions that candidates may have with the public.  Such measures not only risk violating

the rights of the candidates and keeping voters ignorant, but "signal disrespect for the equality of citizens with their decision-makers" by assuming that voters must be protected from their own bad judgment. Failinger, Can a Good Judge Be a Good Politician?, 70 Mo. L. Rev. at 440-41. Thus, the best solutions are likely to involve attempts to enhance the dialogue, adding more voices rather than silencing the candidate. Whitney v. California, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)(when government believes speech is offensive or misguided, "the remedy to be applied is more speech, not enforced silence"). Because the effect of SCR 60.06(2)(b)1, 60.06(2)(b)4 and 60.06(4) is to limit the discussion without providing any appreciable benefit in return, these canons violate the First Amendment and may not stand.

## ORDER

IT IS ORDERED that

1. Plaintiff John Siefert's motion for summary judgment. dkt. #31, is GRANTED; defendants' motion for summary judgment, dkt. #48, is DENIED.

2. It is DECLARED that Wisconsin Supreme Court Rules 60.06(2)(b)1, 60.06(4) and the prohibition on endorsing partisan candidates in 60.06(2)(b)4 are unconstitutional because they violate the First Amendment. Defendants James C. Alexander, Ginger Alden, Donald Leo Bach, John R. Dawson, David A. Hansher. Gregory A. Peterson, William Vander

Loop, Michael R. Miller, James M. Haney and any future members of the Wisconsin Judicial Commission are ENJOINED from enforcing these rules against plaintiff.

3. The clerk of court is directed to enter judgment in favor of plaintiff and close this case.

Entered this 17th day of February, 2009.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge